WO                                                                                             **JWB**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mark Ira Tannenbaum, | No. CV 05-1422-PHX-JAT (JRI) |
| Plaintiff, | **ORDER** |
| vs. | |
| State of Arizona, et al., | |
| Defendants. | |

Plaintiff Mark Ira Tannenbaum brought this civil rights action under 42 U.S.C. § 1983 against various officials from the Arizona Department of Corrections (ADC). Defendants filed a Motion for Summary Judgment, which was fully briefed by the parties (Doc. ## 279, 331, 342). Plaintiff has also filed a Motion for Temporary Restraining Order and Preliminary Injunction and a Motion for Judicial Notice, which are also fully briefed (Doc. ## 273, 276, 277, 341, 346, 350). The Court also issued an Order to Show Cause why the unserved defendants should not be dismissed, and Plaintiff responded with a "Motion to Show Cause" (Doc. ## 334, 338). The Court will grant Defendants' summary judgment motion, deny Plaintiff's motions, dismiss the unserved Defendants, and terminate this action.

**I.    Procedural History**

Plaintiff filed this 42 U.S.C. § 1983 action on May 13, 2005 against various ADC employees. Plaintiff filed a First Amended Complaint on December 9, 2005 (Doc. # 8). Plaintiff named the following Defendants: (1) the State of Arizona; (2) ADC; (3) Dora Schriro, ADC Director; (4) the Medical Director (name unknown); (5) Florence Unit

1 Complex Warden (name unknown); (6) Gene Greeley, Facility Health Administrator; (7)
2 Gary Pinkstaff, Facility Health Administrator;[1]; (8) Stephen Gal, East Unit Deputy Warden;
3 (9) Carson McWilliams, East Unit Deputy Warden; (10) East Unit Medical at Florence Unit;
4 (11) Dr. Quirino Valeros, ADC physician; (12) Donald Berry, Correctional Officer IV; and
5 (13) John Chavez, Correctional Sergeant.  Upon screening, the Court dismissed the East
6 Medical Unit as an improper Defendant (Doc. # 77 at 7).  The Court also informed Plaintiff
7 that he could amend his complaint to name the unknown Defendants when he learned their
8 identities (id. at 5).  The Court ordered service of the following claims on the remaining
9 Defendants (Doc. # 77):

10 (1) Plaintiff's allegations that (i) Valeros, Pinkstaff, and Schriro were deliberately
11 indifferent to Plaintiff's medical needs by refusing Plaintiff treatment for his knees and legs,
12 (ii) Valeros and Pinkstaff were deliberately indifferent to Plaintiff by denying him an extra
13 mattress and pillow, and (iii) the State of Arizona, ADC, Schriro, Pinkstaff, and Valeros
14 failed to make reasonable accommodations for Plaintiff's disabilities in violation of the
15 American with Disabilities Act (ADA) and the Rehabilitation Act (RA);

16 (2) Plaintiff's allegations that (i) Pinkstaff, Berry, Chavez, Gal, and Valeros were
17 deliberately indifferent by taking away Plaintiff's metal knee immobilizers because they were
18 a security risk and replacing them with less effective plastic braces and (ii) the State of
19 Arizona, ADC, Gal, Berry, Chavez, Dr. Valeros, Schriro, and Pinkstaff failed to make
20 reasonable accommodation for Plaintiff's disabilities;

21 (3) Plaintiff's allegations that (i) Pinkstaff, Greeley, Gal, McWilliams, Dr. Valeros,
22 and Schriro were deliberately indifferent to Plaintiff and (ii) the State of Arizona, ADC,
23 Pinkstaff, Greeley, Gal, McWilliams, Dr. Valeros, and Schriro failed to make reasonable
24 accommodations for Plaintiff's disability by refusing to repair Plaintiff's wheelchair; and

---

[1] Pinkstaff died in October 2006.  His wife, Linda Pinkstaff, has been substituted as his personal representative (Doc. # 195).

- 2 -

1  (4) Plaintiff's allegations that Schriro, Pinkstaff, Greeley, and Dr. Valeros were
2  deliberately indifferent to Plaintiff by refusing to provide Plaintiff proper treatment for his
3  infected hair follicles.

4  Thereafter, the Court granted Defendants' Motion to Dismiss Count IV for failure to
5  exhaust administrative remedies (Doc. # 154). The parties also stipulated to dismiss that
6  portion of Count I that alleged the medical staff at the East Unit denied Plaintiff an extra
7  mattress and pillow (Doc. # 255).

## II.  Factual Background

Plaintiff entered the ADC on January 23, 2004 (Defs' Statement of Facts (DSOF), Doc. # 280 ¶ 25). He was housed at the Arizona State Prison Complex–Phoenix, Alhambra Reception Center from January 23, 2004 until January 29, 2004 (Doc. # 280, Ex. A). In 1992, Plaintiff was diagnosed with Reflex Sympathetic Dystrophy (DSOF ¶¶ 30-31). Plaintiff has walked with crutches since 1998 and had a spinal cord stimulator implanted in 1999 (DSOF ¶¶ 29, 32). When Plaintiff entered the ADC, he had a knee immobilizer for each leg (DSOF ¶ 27). The brace was fabric and contained metal rods (DSOF ¶ 28).

During a physical examination on January 23, 2004, Dr. Sabal noted that Plaintiff had multiple surgeries on both knees, had a spinal cord stimulator, and had chronic complex regional pain syndrome in his left leg (DSOF ¶ 26). Dr. Sabal requested lab work for Plaintiff and authorized non-duty status and a lower bunk and allowed Plaintiff to use his own knee braces, shoes, and crutches (id.).

Plaintiff was transferred to the East Unit at ASPC–Florence on January 29, 2004 (DSOF ¶ 34). Two days later, Plaintiff submitted two Health Needs Requests (HNR), wherein he requested an update of the SNO issued by Dr. Sabal, an extra pillow and mattress, and repair to his wheelchair (DSOF ¶¶ 35, 39). Dr. Valeros saw Plaintiff in response to his HNR. Dr. Valeros noted Plaintiff's RSD, multiple knee surgeries, treatment at two Tucson hospitals, and spinal cord stimulator (DSOF ¶ 40). Dr. Valeros also assessed Plaintiff with status post multiple arthroscopy of both knees, RSD of the left leg, and status post spinal cord

1 stimulator (id.).² Dr. Valeros prescribed a wheelchair, a knee brace, shoes, and an extra
2 pillow and mattress for Plaintiff; the SNO expired on February 11, 2004 (id.). Dr. Valeros
3 also ordered x-rays of both knees and the lumbo-sacral spine (id.).

4 Dr. Valeros saw Plaintiff on March 10, 2004, in response to Plaintiff's complaint of
5 shoulder pain due to wheeling himself around (DSOF ¶¶ 44, 45). Dr. Valeros noted that the
6 x-rays of Plaintiff's knees were normal and the lumbo-sacral spine x-ray showed mild
7 degenerative joint disease (DSOF ¶ 45). Dr. Valeros assessed Plaintiff with degenerative
8 joint disease of the lumbo-sacral spine and an old ligament injury of the knees (id.).³ Dr.
9 Valeros prescribed a bilaterally hinged knee brace, a wheelchair pusher for one month to
10 alleviate Plaintiff's shoulder pain, and discontinuation of the knee immobilizer (id.). Dr.
11 Valeros later renewed Plaintiff's wheelchair pusher (DSOF ¶ 49).

12 Plaintiff saw Dr. Valeros on May 4, 2004, in response to Plaintiff's HNR regarding
13 knee pain and paperwork for ADA status (DSOF ¶ 52). Dr. Valeros assessed Plaintiff as
14 status post arthroscopies to both knees and degenerative joint disease. Dr. Valeros placed
15 Plaintiff on non-duty status, and he advised Plaintiff to ambulate with the wheelchair for
16 muscle strengthening (DSOF ¶ 52). Dr. Valeros also issued a SNO, to expire on August 4,
17 2004, placing Plaintiff on non-duty status and providing Plaintiff with a wheelchair, leg brace
18 with shoes, and an extra pillow and mattress (DSOF ¶ 53).

19 On July 1, 2004, Plaintiff's knee braces were taken from him because they contained
20 metal (DSOF ¶ 63). On July 13, 2004, Plaintiff met with Dr. Valeros to discuss an
21 alternative knee brace (DSOF ¶ 69). Dr. Valeros ordered a substitute brace without metal
22 and issued another SNO for non-duty status, a wheelchair, and special shoes (DSOF ¶ 70).
23 On August 19, 2004, Plaintiff was provided two large hinged knee braces (DSOF ¶ 81).

---

25 ² Plaintiff disputes this fact to the extent that he claims that Valeros did not perform
26 an exam on Plaintiff's right knee (Plaintiff's Controverting Statement of Facts (PCSOF) ¶ 40).

27 ³ Plaintiff disputes this fact (PCSOF ¶ 45). He claims that he did not have a ligament
28 injury to his right knee (id.). But Plaintiff readily acknowledges that he did previously injure his right knee (Doc. # 331 at 3).

1    Plaintiff complained on September 13, 2004, that his wheelchair needed repair on
2 (DSOF ¶ 85). His wheelchair was exchanged on November 29, 2004, and his original
3 wheelchair was returned to him on December 7, 2004 (DSOF ¶¶ 94, 97). On December 28,
4 2004, Dr. Valeros issued a SNO, to expire on June 28, 2005, for non-duty status, a
5 wheelchair, leg braces and shoes, an extra pillow and mattress, and sweat pants (DSOF ¶
6 101). On January 25, 2005, Plaintiff again complained that his wheelchair needed repair; his
7 request was scheduled by the Central Unit (DSOF ¶ 104).

8    Plaintiff was transferred to ASPC – Lewis on March 18, 2005, where he remains
9 today.

**III.    Defendants' Motion for Summary Judgment**

Defendants move for summary judgment on all of Plaintiff's claims (Doc. # 279). Defendants argue that Defendants were not deliberately indifferent to Plaintiff's serious medical needs. Specifically, Defendants contend that Schriro's sole involvement in Plaintiff's case was responding to his grievances, which does not establish liability for § 1983. Defendants submit that Greeley and Pinkstaff, as FHAs, do not have the authority to authorize medical treatment or have any involvement in the repair of wheelchairs. Further, Defendants contend that Pinkstaff was not involved in seizing Plaintiff's knee braces and only responded to Plaintiff's grievances on that issue. As for McWilliams, Defendants assert that he was not responsible for any medical care Plaintiff received nor was he involved in Plaintiff's wheelchair repair. With respect to Berry, Chavez, and Gal, Defendants argue that Plaintiff has not established that they were personally involved in any alleged constitutional violation and, even if they were, they did not violate Plaintiff's constitutional rights when Plaintiff's knee braces where seized. Further, Defendants contend that Gal was not involved in Plaintiff's wheelchair repair.

As for Valeros, Defendants claim that he was not deliberately indifferent to Plaintiff's serious medical needs; rather, Defendants argue that Valeros consistently examined and treated Plaintiff and Plaintiff's belief that he should have been referred to an orthopedic specialist is nothing more than a disagreement over treatment, which does not give rise to a

1 constitutional violation.

2 Defendants further argue that Plaintiff has failed to establish an ADA or RA claim.
3 They contend that: (1) there is no individual liability under either the ADA or RA; (2) the RA
4 only applies if a program receives federal funding, which the ADC does not; and (3) no
5 Defendant violated the ADA or RA. Finally, Defendants contend that the Eleventh
6 Amendment bars Plaintiff's monetary claim and that Defendants are entitled to qualified
7 immunity.

8 In response to Defendants' motion, Plaintiff alleged that Schriro was notified that
9 other Defendants were deliberately indifferent to Plaintiff but failed to take steps to remedy
10 the violations (Doc. # 331 at 4). He further claimed that Greeley's and Pinkstaff's positions
11 as Facility Health Administrators are the equivalent of Deputy Wardens and they are
12 therefore responsible for the operations of the medical unit. Plaintiff specifically claimed
13 that Greeley failed to ensure his wheelchair was repaired in a timely manner (id. at 6-7). As
14 for McWilliams, Plaintiff claimed that he is responsible for the "safety and security" of all
15 inmates and is therefore responsible for any problem an inmate faces with medical care.

16 Plaintiff also contended that Berry, Chavez, and Gal personally seized Plaintiff's knee
17 braces and therefore rendered a medical decision that constituted deliberate indifference to
18 his serious medical needs (id. at 10). Plaintiff alleged that Valeros misdiagnosed and refused
19 to examine or treat Plaintiff's knee injury, knowing that Plaintiff would have a strong
20 likelihood of developing RSD in his right leg (Doc. # 331 at 13). Finally, Plaintiff supported
21 his claims under the ADA/RA by stating that he was denied services and Defendants did not
22 make accommodations for Plaintiff's disabilities (id. at 15-18).

23 In Reply, Defendants reiterate their argument that Schriro is not liable for any alleged
24 constitutional violation because she was not aware of any actual violation (Doc. # 342).
25 Defendants also dispute Plaintiff's contention that Greeley and Pinkstaff are the "equivalent"
26 of a deputy warden in a unit and are therefore responsible for all of the medical treatment
27 provided to inmates. Defendants contend that McWilliams was not responsible for ensuring
28 that Plaintiff's wheelchair was repaired because he had no involvement at all in wheelchair

1 ordering, distribution, maintenance, or repair (Doc. # 342 at 4). Defendants also maintain 2 that Chavez, Berry, and Gal were not deliberately indifferent when Plaintiff's knee 3 immobilizers were taken away. They also contend that no Defendant violated Plaintiff's 4 constitutional rights with respect to the repair of his wheelchair. And finally, Defendants 5 reiterate that Plaintiff has not presented a viable claim under the ADA or RA and that 6 Defendants are entitled to qualified immunity (id. at 10-11).

**IV.     Legal Standards**

### A.     Summary Judgment

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the non-moving party, "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Under summary judgment practice, the moving party bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, which it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp., 477 U.S. at 323. If the moving party meets its initial responsibility the burden then shifts to the opposing party who must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id. at 250; see Triton Energy Corp. v. Square D. Co., 68 F.3d 1216, 1221 (9th Cir. 1995). The opposing party need not establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968).

When considering a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. See Fed. R. Civ. P. 56(c). The evidence presented by the parties must be admissible.

1  Fed. R. Civ. P. 56(e). And the evidence of the non-movant is "to be believed, and all
2  justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255.

3  **B.     Deliberate Indifference**

4  The Eighth Amendment requires that prisoners receive adequate medical care. Estelle
5  v. Gamble, 429 U.S. 97, 104 (1976). Under 42 U.S.C. § 1983, to maintain an Eighth
6  Amendment claim based on prison medical treatment, an inmate must show "deliberate
7  indifference to serious medical needs." Id. The test for deliberate indifference consists of
8  two parts in the Ninth Circuit. McGuckin v. Smith, 974 F.2d 1050 (9th Cir.1991), overruled
9  on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir.1997) (*en banc*).
10 A plaintiff must first "show a serious medical need by demonstrating that failure to treat a
11 prisoner's condition could result in further significant injury or the unnecessary and wanton
12 infliction of pain." Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal quotations
13 and citations omitted). Second, a plaintiff must establish deliberate indifference to that need.
14 McGuckin, 974 F.2d at 1060. A state prison official is deliberately indifferent if he both
15 knows of and disregards an excessive risk to an inmate's health. Farmer v. Brennan, 511
16 U.S. 825, 837 (1994). This requires a "purposeful act or failure to respond to a prisoner's
17 pain or possible medical need" and "harm caused by the indifference." Jett, 439 F.3d at
18 1096. Deliberate indifference may be shown when an official denies, delays, or intentionally
19 interferes with treatment or by the way that a medical professional provided the care. Id. A
20 prisoner need not show his harm was substantial; however, such would provide additional
21 support for the inmate's claim that the defendant was deliberately indifferent to his needs.
22 McGuckin, 974 F.2d at 1060.   A prisoner does not have to prove that he was completely
23 denied medical care in order to demonstrate deliberate indifference, Lopez v. Smith, 203
24 F.3d 1122, 1132 (9th Cir. 2000), but if the harm is an "isolated exception" to the defendant's
25 "overall treatment of the prisoner [it] ordinarily militates against a finding of deliberate
26 indifference." Id. (citations omitted).

27 Negligence or medical malpractice does not establish a sufficiently culpable state of
28 mind. Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980). "[A] mere

1 'difference of medical opinion . . . [is] insufficient, as a matter of law, to establish deliberate
2 indifference.'" Toguchi v. Chung, 391 F.3d 1051, 1058 (9th Cir. 2004) (citations omitted).
3 To prevail on a claim involving choices between alternative courses of treatment, a prisoner
4 must show that the course of treatment the doctors chose was medically unacceptable in light
5 of the circumstances and that it was chosen in conscious disregard of an excessive risk to
6 plaintiff's health. Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996).

7 **V.     Motion for Judicial Notice**

8 At the outset, the Court must address Plaintiff's Motion for Judicial Notice (Doc. #
9 341), in which he seeks the Court to take notice of two proposed "facts": (1) any treatment,
10 examination, or diagnosis did not occur in the absence of any notation in Plaintiff's medical
11 file to that effect regarding said treatment, examination, or diagnosis; and (2) Plaintiff could
12 not have refused his wheelchair, because he would not have made a complaint regarding his
13 wheelchair and would not still be confined to a wheelchair.

14 Despite Plaintiff's assertions to the contrary, these are not facts within the meaning
15 of Federal Rule of Evidence 201(b), (d), or (f); that is, facts "not subject to reasonable
16 dispute." These are not facts "capable of accurate and ready determination by resort to
17 sources whose accuracy cannot reasonably be questioned." Plaintiff's proffered "facts" are
18 simply arguments that can be considered on summary judgment but are not appropriate for
19 judicial notice. Plaintiff's motion will be denied.

20 **VI.    Analysis of Deliberate Indifference Claims**

21     **A.     Treatment for Plaintiff's Knees and Legs**

22 In Count I of his First Amended Complaint, Plaintiff alleged that Valeros, Pinkstaff,
23 and Schriro were deliberately indifferent to Plaintiff's serious medical needs by refusing him
24 treatment for his knees and legs (Doc. # 8 at 4). The Court will address each Defendant in
25 turn.

26     *1.     Dr. Valeros*

27 In Plaintiff's First Amended Complaint, he alleged that Valeros was deliberately
28 indifferent to his serious medical needs by failing to send him to an orthopedic specialist

- 9 -

(Doc. # 8 at 4A). Consequently, Plaintiff alleged that this decision constituted a "refusal" to treat his right knee (id.). Plaintiff further alleged that Valeros stated that "the ADC would not treat [his] nerve disorder in his left leg[,]" which results in constant extreme pain (id.).

In support of their argument that Valeros was not deliberately indifferent to Plaintiff's serious medical needs, Defendants submit Valeros's affidavit (Doc. # 280, Ex. D, Valeros Aff.). Valeros attested that when he first examined Plaintiff he requested Plaintiff's prior medical records, ordered Plaintiff special equipment, and ordered x-rays of both knees (id. ¶ 4). He further stated that he continued to renew Plaintiff's SNOs for his wheelchair, knee braces, mattresses and pillows, and non-duty status (id. ¶¶ 6, 10, 16, 20, 23, 29, 37, 56). And the evidence indicates that Valeros examined Plaintiff on at least 16 occasions over a 13 month period (DSOF ¶¶ 40, 45, 49, 52, 56, 58, 59, 69, 73, 78, 83, 86, 90, 100, 105, 107).[4] Finally, Valeros averred that based on Plaintiff's medical history and the fact that there is no cure for RSD, he did not believe a referral to a specialist was warranted (Valeros Aff. ¶ 64).

Defendants have met their initial burden of establishing a lack of a triable issue of fact as to deliberate indifference on Valeros's part. Plaintiff cannot defeat summary judgment by merely demonstrating "that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 474 U.S. 574, 586 (1986).

In his response, Plaintiff claims that Valeros was deliberately indifferent by "not examining, misdiagnosing, and refusing to treat [his] knee injury, knowing that [he] would have a high risk of developing RSD in his right lower leg if treatment wasn't done" (Doc. # 331 at 13). Further, Plaintiff claims that Valeros failed to treat Plaintiff's RSD (id.). But Plaintiff's allegation that Valeros did nothing to treat Plaintiff's right leg and RSD is simply conclusory, unsupported and is, in fact, contradicted by the record. At his first appointment, Valeros ordered x-rays of both knees, which were unremarkable (Valeros Aff ¶ 7, Doc. # 280, Ex. D, Attach. 4). He also authorized knee braces for both legs, provided Plaintiff with a wheelchair, and ordered items that attempted to provide comfort to Plaintiff in both legs

---

[4] Plaintiff's first visit with Valeros was on February 11, 2004 and his last visit was on March 15, 2005 (DSOF ¶¶ 40, 109).

- 10 -

1  (Valeros Aff. ¶¶ ¶¶ 6, 10, 16, 20, 23, 29, 37, 56).  Consequently, the allegation that Valeros
2  "did nothing" is conclusory and insufficient to defeat summary judgment.  Taylor v. List,
3  880 F.2d 1040, 1045 (9th Cir. 1989).

4  Plaintiff also makes much about Valeros's alleged failure to physically examine his
5  right knee and take specific measurements about its functioning  (Doc. # 329, Pl's Statement
6  of Facts (PSOF) ¶ 52).  Plaintiff also disagrees with Valeros's decision not to order a CT
7  Scan after the x-rays of his knees were unremarkable (id. ¶ 55).  But these disagreements are
8  nothing more than a difference in medical opinion, which does not amount to deliberate
9  indifference.  Toguchi v. Chung, 391 F.3d 1051, 1058 (9th Cir. 2004).  Plaintiff instead must
10 "produce at least some significant probative evidence tending to [show]," T.W. Elec. Serv.,
11 Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (internal quotations
12 and citation omitted), that the treatment Valeros chose was medically unacceptable under the
13 circumstances and that he chose this treatment "in conscious disregard of an excessive risk
14 to plaintiff's health," Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996) (citing Farmer,
15 511 U.S. at 837).  Plaintiff makes no such showing and there is no indication in the record
16 that Valeros did not order additional testing on Plaintiff's knees despite his knowledge of a
17 substantial risk to Plaintiff's health.  In contrast, Valeros has attested that it was his honest
18 medical judgment that such testing was not medically necessary.

19 Moreover, Plaintiff has failed to introduce any expert medical testimony to support
20 his contention that further treatment *was* necessary to treat his medical conditions.  See
21 Gorney v. Meaney, 150 P.3d 799, 804 (Ariz. App. 2 Div. 2007) (citing Gregg v. Nat'l Med.
22 Health Care Servs., Inc., 699 P.2d 925, 928 (Ariz. App. 2 Div. 1985)).  To the extent that
23 Plaintiff contends his medical records support his position, they require interpretation by an
24 expert, and it was incumbent upon Plaintiff to provide an affidavit or deposition of an expert
25 to establish the appropriate standard of care.  See Hutchinson v. United States, 838 F.2d 390,
26 393 (9th Cir. 1988) (granting summary judgment against a plaintiff who relied only on her
27 own allegations and conclusory statements that defendants had been negligent and who failed
28 to provide affidavits or depositions of experts).

- 11 -

1 Plaintiff also argues that Valeros should have referred Plaintiff to a specialist. But as
2 Defendants point out, Plaintiff has no independent constitutional right to outside medical care
3 supplemental or additional to the medical care provided by the prison staff within the
4 institution. See Roberts v. Spalding, 783 F.2d 867, 870 (9th Cir. 1986); Estelle, 429 U.S. at
5 103-04. To the extent that Plaintiff alleges that Valeros's failure to act caused him to develop
6 RSD in his right leg, that assertion is not supported by any probative evidence, as noted
7 above.[5] Indeed, Plaintiff does not dispute Valeros's evidence that RSD develops as a result
8 of an injury, surgery, or for no reason at all (DSOF ¶ 30, PSOF ¶ 30). It is undisputed that
9 Plaintiff had a pre-existing injury to his right leg (Doc. # 280, Ex. J at 35:19-25, 36:1-7).
10 Even if the Court were to find that Valeros failed to recognize that something more should
11 have been done to treat Plaintiff's right leg, there is no evidence that Valeros's conduct
12 would constitute anything more than negligence. But indifference, negligence, or medical
13 malpractice do not rise to the level of an Eighth Amendment violation. Broughton, 622 F.2d
14 at 460 (citations omitted).

15 Ultimately, Valeros's action do not demonstrate a "purposeful act or failure to respond
16 to [Plaintiff's] pain or possible medical need." Jett, 439 F.3d at 1096. Plaintiff has simply
17 not introduced any medical evidence from which the Court could draw the inference that
18 Valeros was *deliberately* indifferent or *purposely* failed to act in response to Plaintiff's
19 medical needs. See McGuckin, 974 F.2d at 1060. Valeros is therefore entitled to summary
20 judgment on this claim.

21 ### *2. Pinkstaff and Schriro*

22 In his First Amended Complaint, Plaintiff alleged that Schriro and Pinkstaff refused
23 him treatment on both of his knees and legs (Doc. # 8 at 4).

24 In his deposition, Plaintiff acknowledged that his only contact with either Schriro or
25 Pinkstaff on this issue was limited to their responses to Plaintiff's grievances (Doc. # 280,

---

[5] Notably, Plaintiff does not articulate precisely what an outside specialist could have done to better treat Plaintiff's RSD. Nor does Plaintiff elaborate on what Valeros should have done to prevent Plaintiff's right lower leg from developing RSD.

- 12 -

1 Ex. T at 62:7-19; 72:7-10).  Plaintiff contends that through his grievances, Schriro and
2 Pinkstaff became aware of the violation of his constitutional rights but failed to act,
3 constituting deliberate indifference.  But the mere denial of a grievance does not give rise to
4 the inference of active unconstitutional behavior; where a defendant's only involvement in
5 the allegedly unconstitutional conduct is the denial of administrative grievances, the failure
6 to intervene on a prisoner's behalf to remedy alleged unconstitutional behavior does not
7 amount to active unconstitutional conduct for purposes of § 1983.  Shehee v. Luttrell, 199
8 F.3d 295, 300 (6th Cir. 1999).  In addition, Plaintiff has not demonstrated that his
9 constitutional rights were violated, vitiating the possibility that Schriro or Pinkstaff failed to
10 act to prevent the alleged violation.

11 Finally, Plaintiff has not meaningfully contradicted Defendants' evidence that
12 Pinkstaff was not authorized to make decisions regarding an inmates' medical treatment or
13 direct medical treatment (DSOF ¶¶ 19-20).  Plaintiff has simply argued that Pinkstaff stated
14 in response to one of Plaintiff's grievances, "you have chronic RSD of the left leg" and
15 "there is no medical evidence that would warrant a consult by an orthopedic specialist at this
16 time" (Doc. # 331 at 8).  Plaintiff argues that this response proves that Pinkstaff refused to
17 treat his RSD because he "sounds like a doctor."  But Plaintiff does not dispute Defendants'
18 evidence that Pinkstaff was reiterating the finding by Plaintiff's health care provider and did
19 not independently assess Plaintiff's medical needs.  For these reasons, Schriro and Pinkstaff
20 are entitled to summary judgment on this claim.

### B. Confiscation of Plaintiff's Knee Braces

22 In his First Amended Complaint, Plaintiff alleged that the Pinkstaff, Gal, Berry,
23 Chavez, and Valeros were responsible for the confiscation of his knee immobilizers. Plaintiff
24 claimed that he waited seven weeks to receive replacement knee braces, which do not
25 properly fit his legs (Doc. # 8 at 5-5A).

#### 1. Individual Responsibility

##### a. Gal, Chavez, and Berry

28 Defendants first contend that neither Gal, Chavez, nor Berry were responsible for

- 13 -

1 taking Plaintiff's knee braces.  Plaintiff emphatically disputes this fact in his response to
2 Defendants' summary judgment motion and in his deposition (Doc. # 331 at 9; Doc. # 280,
3 Ex. Q at 46:11-15).  Consequently, the Court cannot conclude that Gal, Chavez, and Berry
4 were not the officers who confiscated Plaintiff's knee braces.

  *b.* *Pinkstaff*

As before, it is undisputed that Plaintiff's only contact with Pinkstaff was limited to his response to Plaintiff's grievances  (Doc. # 280, Ex. T at 72:7-10).  Defendants contend that Pinkstaff did not participate at all in the decision to confiscate Plaintiff's metal knee braces.  In support, Defendants submit the affidavit of Dr. Michael Hegmann, ADC Deputy Medical Director (Doc. # 280, Ex. F, Hegmann Aff.).  Hegmann attests that Pinkstaff did not have the authority to make any medical decisions and took no part in providing medical care to inmates.  Plaintiff does not meaningfully dispute this evidence.  Defendants have met their initial burden of establishing a lack of a triable issue of fact as to Pinkstaff's connection to Plaintiff's deliberate indifference claim regarding his knee braces.  Plaintiff cannot defeat summary judgment by merely demonstrating "that there is some metaphysical doubt as to the material facts."  Matsushita, 474 U.S. at 574.  Plaintiff does not respond to Defendants' argument that Pinkstaff was not involved in the decision to confiscate Plaintiff's knee braces.  There is no link between Pinkstaff and the confiscation of Plaintiff's knee braces.  See Rizzo v. Goode, 423 U.S. 362, 371-72, 377 (1976).  Pinkstaff is entitled to summary judgment on this claim.

  ***2.*** ***Analysis***

  *a.* *Gal, Chavez, and Berry*

Defendants claim that it was necessary to confiscate Plaintiff's knee braces because they contained metal and constituted a security risk.  In support, they provide the affidavits of Gal, Chavez, and Berry, who attest that Plaintiff's knee braces were seized for security purposes (Doc. # 280, Ex. G, Gal Aff. ¶ 5; id. Ex. H, Chavez Aff. ¶ 5; id. Ex. I, Berry Aff. ¶ 4).  In his Response, Plaintiff does not dispute that his knee braces were a potential security risk.  Indeed, he concedes that they contained metal and could be used for fabricating shanks

- 14 -

1   or other weapons (id., Ex. Q at 46:1-4).  Rather, Plaintiff claims because he possessed the
2   knee braces since his arrival at the East Unit, he should have been permitted to keep them.
3         The Court cannot conclude that Defendants were deliberately indifferent to Plaintiff's
4   medical needs in confiscating his knee braces.  It is undisputed that Plaintiff's knee braces
5   contained metal and they are a security risk.  See Bell v. Wolfish, 441 U.S. 520, 546 (1979)
6   ("[M]aintaining institutional security and preserving internal order and discipline are
7   essential goals that may require limitation or retraction of the retained constitutional rights
8   of . . . convicted prisoners . . . .").  While Plaintiff contends that he had these braces for a
9   considerable amount of time before they were taken, he neither alleges nor demonstrates that
10  they were taken away for any reason other than security.  Moreover, many courts have
11  recognized the inherent security threat in metal knee braces and have consistently upheld
12  prison officials' decisions to confiscate them and provide inmates with alternative knee
13  braces that do not contain metal.  See Lerma v. Bell, 2 Fed. Appx. 782 (9th Cir. 2001)
14  (confiscation of elastic knee brace for legitimate security concerns did not state § 1983
15  violation); Serrano v. Folino, 2008 WL 723525, *6 (W.D. Pa. March 16, 2008) (replacing
16  knee brace containing metal or plastic with knee brace without metal or plastic did not
17  constitute deliberate indifference); Bieber v. Wisconsin Dept. Of Corrections, 62 Fed. Appx.
18  714 (7th Cir. 2003) (substitution of elastic sleeve for metal knee brace due to security
19  concerns did not state § 1983 violation); May v. Oklahoma Dept. of Corrections, 215 F.3d
20  1337 (10th Cir. 2000) (unpublished) ("It is clear that the [prison's] denial of [plaintiff's]
21  request for a hinged brace served a legitimate governmental purpose, that of preventing the
22  kind of security problems created by having metal objects available to inmates).
23        In addition, Chavez sent Plaintiff directly to the medical unit after his knee braces
24  were taken, precluding a finding that he was *deliberately* attempting to inflict pain onto
25  Plaintiff (Doc. # 331 at 10).  And it is clear from the record that replacement knee braces
26  were ordered for Plaintiff on July 13, 2004 (Doc. # 280, Ex. D, Attach. 22).  The fact that
27  replacement knee braces were not delivered until August 19, 2004 is not attributable to Gal,
28  Chavez, or Berry.  Consequently, the Court cannot conclude that Gal, Chavez, or Berry were

1 deliberately indifferent when they confiscated Plaintiff's metal knee braces.

   *b.    Valeros*

Plaintiff has also alleged that there was a 7-week delay in receiving his replacement knee braces, which are also not as effective as his original knee braces. But it is undisputed that Valeros saw Plaintiff on July 13, 2004, and ordered him replacement knee braces (DSOF ¶ 70). And while Plaintiff did have to wait until August 19, 2004, to receive his new knee braces, that delay is not attributable to Valeros. Moreover, Plaintiff has neither alleged nor demonstrated that Valeros *knew* that the replacement knee braces would result in a significant threat to Plaintiff's health or safety. Consequently, the Court cannot conclude that Valeros was deliberately indifferent to Plaintiff with respect to his knee braces. Valeros is entitled to summary judgment on this claim.

   **C.    Repair of Plaintiff's Wheelchair**

In his First Amended Complaint, Plaintiff alleged that Pinkstaff, Greeley, Gal, McWilliams, Dr. Valeros, and Schriro were deliberately indifferent to Plaintiff's serious medical needs by failing to effect a timely repair of his wheelchair (Doc. # 8 at 6-6A).

Defendants have introduced evidence that none of the Defendants named in this claim were responsible for scheduling wheelchair repairs. Specifically, Defendants contend that: (1) Schriro was only responsible for responding to Plaintiff's grievance on this issue (Doc. # 279 at 8); (2) Pinkstaff, Greeley, Gal, and McWilliams never processed wheelchair repair requests (DSOF ¶¶ 164-65, 168); and (3) Valeros prescribed Plaintiff a wheelchair but was not responsible for its maintenance (DSOF ¶ 38). Moreover, Defendants articulated the process for wheelchair issuance and repair: (1) a health care provider prescribes the wheelchair; (2) the nursing staff writes up the provider's order; and (3) the supply employee issues the wheelchair (DSOF ¶ 36). When a wheelchair requires repair: (1) the inmate submits a health needs request; (2) the nursing staff makes a request to the Administrative Assistant III and Complex Health Services, who faxes the request to the repair company; and (3) the repair company schedules an appointment (DSOF ¶¶ 37-38).

In his Response, Plaintiff does not dispute this evidence. And he has not introduced

any evidence, apart from his bare allegations, that any of the named Defendants were responsible for arranging his wheelchair repair and failed to do so. When a prisoner attempts to hold a prison employee responsible for deliberate indifference, the prisoner must establish individual fault. Leer v. Murphy, 844 F.2d 628, 634 (9th Cir. 1988). Sweeping conclusory allegations will not be sufficient to prevent summary judgment. Id. "The prisoner must set forth specific facts as to each individual defendant's deliberate indifference." Id. at 634. He must prove that the specific prison official was deliberately indifferent and that this indifference was the actual and proximate cause of the injury. Id. Here, Plaintiff has not provided anything more than conclusory allegations that each of the Defendants were responsible or required to arrange the repair of his wheelchair. For this reason alone, Plaintiff's claim fails.

But his claim is unavailing for two additional reasons. First, Plaintiff has never alleged that he was without a wheelchair, and he acknowledged in his First Amended Complaint that someone was sent to repair his wheelchair but that the repair technician discovered he did not have all of the necessary parts (Doc. # 8 at 6). Because it is plain that someone was sent to repair Plaintiff's wheelchair, the Court cannot conclude that anyone was *deliberately* indifferent to Plaintiff's need for a wheelchair. Consequently, Defendants are entitled to summary judgment on this claim.

**VII.  ADA/RA Claims**

Plaintiff has also alleged that Defendants failed to make reasonable accommodations for Plaintiff's disabilities, in violation of the ADA and the RA by their deliberate indifference to his knees and legs, confiscation of his knee immobilizers, and failure to repair his wheelchair (Doc. # 8 at 4-6).

"Title II of the ADA and § 504 of the [Rehabilitation Act] both prohibit discrimination on the basis of disability." Lovell v. Chandler, 303 F.3d 1039, 1052 (9th Cir. 2002). Title II of the ADA and the RA apply to inmates within state prisons.[6] See Pennsylvania Dept. of

---

[6] The Rehabilitation Act is materially identical to and the model for the ADA, except that it is limited to programs that receive federal financial assistance. Defendants contend

- 17 -

1 Corrections v. Yeskey, 524 U.S. 206, 210 (1998); see also Armstrong v. Wilson, 124 F.3d
2 1019, 1023 (9th Cir.1997). "The Rehabilitation Act is materially identical to and the model
3 for the ADA, except that it is limited to programs that receive federal financial assistance."
4 Armstrong v. Davis, 275 F.3d 849, 862 n.17 (9th Cir. 2001) (internal quotations omitted).
5 Title II of the ADA was expressly modeled after § 504 of the Rehabilitation Act. Zuckle
6 v. Regents of the University of California, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999) ("there
7 is no significant difference in analysis of the rights and obligations created by the ADA and
8 the Rehabilitation Act"). Because the ADA has a broader scope, the Ninth Circuit analyzes
9 both Acts under an ADA standard. Armstrong, 275 F.3d at 862.

10 The ADA authorizes suits by private citizens for money damages against public
11 entities, Unites States v. Georgia, 546 U.S. 151, 153 (2006); however, it does not authorize
12 suits against individuals. Vinson v. Thomas, 288 F.3d 1145, 1156 (9th Cir. 2002). Thus, to
13 the extent that Plaintiff is attempting to sue Defendants in their individual capacities,
14 summary judgment must be granted.

15 To establish an ADA claim, Plaintiff must demonstrate that he (1) is a handicapped
16 person; (2) who is otherwise qualified; and that Defendants' actions either (3) excluded his
17 participation in or denied him the benefits of a service, program, or activity; or (4) otherwise
18 subjected him to discrimination on the basis of his physical handicap. 42 U.S.C. § 12132;
19 Duffy v. Riveland, 98 F.3d 447, 455 (9th Cir. 1996).

20 For his claims against Defendants in their official capacities, Plaintiff "must prove
21 intentional discrimination on the part of the defendant." Duvall v. County of Kitsap, 260
22 F.3d 1124, 1138 (9th Cir. 2001). But Plaintiff has *never* alleged that he did not receive
23 treatment *because* of his alleged disability. Rather, Plaintiff claimed that Defendants refused
24 to provide him with his desired treatment and thereby denied him adequate medical care. But
25 the ADA cannot be used to bring a claim for medical negligence. See Bryant v. MadiGal,
26 84 F.3d 246, 249 (7th Cir. 1996). Moreover, the Court has already determined that

27
28 that the ADC does not receive federal assistance. But this is immaterial because Plaintiff's claims are analyzed under the same standard.

1 Defendants were not deliberately indifferent to Plaintiff's medical needs.

2 But most importantly, Plaintiff has failed to allege or demonstrate that he was
3 excluded from participation in or denied the benefits of services because of his disabilities.
4 Indeed, Plaintiff acknowledges that he participated in numerous programs while in the East
5 Unit (DSOF ¶¶ 160, 163; PSOF ¶ 163).  Plaintiff contends that access to medical treatment
6 is a "service or program" within the meaning of the ADA.  But as the Court has already
7 determined, Plaintiff's deliberate indifference claims fail, and Plaintiff has not alleged or
8 demonstrated that he was denied any treatment *because* of his disability.  Summary judgment
9 will be granted to Defendants on his ADA/RA claims.

10 **VIII.   Plaintiff's Motion for Injunctive Relief**

11 Because Defendants are entitled to summary judgment, Plaintiff's Motion for
12 Temporary Restraining Order and Preliminary Injunction (Doc. # 277) will be denied as
13 moot.

14 **IX.    Unserved Defendants**

15 On April 21, 2008, the Court ordered Plaintiff to show cause why Defendants Medical
16 Director and Complex Warden should not be dismissed for failure to serve (Doc. # 334).  In
17 Response, Plaintiff has filed a "Motion to Show Cause" contending that he learned the true
18 name of the Medical Director through discovery and attempted to substitute his name within
19 5 days of learning his identity.  Plaintiff also acknowledges that he failed to request that the
20 Complex Warden be served (Doc. # 338 at 3).

21 In the Court's July 10, 2006 Screening Order, Plaintiff was warned that failure to
22 effect service on any Defendant within 120 days of the filing of the complaint or within 60
23 days of the filing of the Screening Order, whichever was later, would result in the dismissal
24 of any defendant not served (Doc. # 77).  On August 9, 2006, Plaintiff was granted an
25 additional 60 days beyond the date of the scheduling order within which to serve the
26 fictitious defendants (Doc. # 96 at 5).  The Scheduling Order was entered on April 17, 2007
27 (Doc. # 167).  Plaintiff was then granted an extension of time until October 5, 2007 to amend
28 his complaint or join parties (Doc. # 207).  But Plaintiff did not effect service on the fictitious

1 defendants by that date and belatedly moved for additional time, which was denied (Doc. ## 239, 250). In his Motion to Show Cause, Plaintiff does not explain why he was not able to timely substitute the names of the fictitious defendants or timely move for an extension of time to effect service. In failing to adduce any explanation for his failure to effect service, despite being provided numerous extensions of time, Plaintiff has not discharged his responsibility under the Order to Show Cause. Consequently, Defendants Medical Director and Complex Warden will be dismissed for failure to serve pursuant to Rule 4(m) of the Federal Rules of Civil Procedure and Local Rule of Civil Procedure 16.2(b)(2)(B)(1).

**X.  Conclusion**

Based on the foregoing, Defendants are entitled to summary judgment on all of Plaintiff's claims. Plaintiff's motion for injunctive relief will be denied as moot, and Defendants Medical Director and Complex Warden will be dismissed for failure to serve.

**IT IS ORDERED** that:

(1) Defendants' Motion for Summary Judgment (Doc. # 279) is **granted**.

(2) Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (Doc. # 277) is **denied as moot**.

(3) Plaintiff's Motion for Judicial Notice (Doc. # 341) is **denied**.

(4) Plaintiff's Motion to Show Cause (Doc. # 338) is **denied**. Defendants Medical Director and Complex Warden are **dismissed** for failure to serve pursuant to Rule 4(m) of the Federal Rules of Civil Procedure.

(5) Plaintiff's action is **dismissed with prejudice**. The Clerk shall terminate this action and enter judgment accordingly.

DATED this 17th day of July, 2008.

James A. Teilborg
United States District Judge